IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No. 13-59-SLR |
| | ) | |
| ROGELIO A. CORDERO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

At Wilmington this $\partial L\sigma^{th}$ day of March, 2013, having conducted an evidentiary

hearing on defendant's motion to suppress and having considered the papers

submitted in connection therewith, the court will deny the motion based on the following

reasoning:

1. **Introduction.** On June 13, 2013, a federal grand jury returned a five-count

indictment charging defendant with:  (1) production/attempted production of child

pornography, in violation of 18 U.S.C. § 2251; (2) transportation of child pornography, in

violation of 18 U.S.C. § 2252A(a)(1); (3) receipt of child pornography, in violation of 18

U.S.C. § 2252A(a)(2); (4) possession of child pornography, in violation of 18 U.S.C. §

2252A(a)(5)(B); and (5) enhanced penalty for registered sex offenders, in violation of 18

U.S.C. § 2260A.  (D.I. 3)

2.  Defendant has moved to suppress statements that he made to law

enforcement officers during a December 20, 2013 video-recorded interview conducted

at the New Castle County Police Department ("NCCPD").  (D.I. 22 )  Defendant claims

that his statements were given in violation of the Fifth Amendment because he invoked his right to counsel and any subsequent waiver of the right to counsel was involuntary. He further contends that law enforcement officers employed coercive tactics to extract the second statement.  Defendant seeks to exclude those statements, as well as any evidence derived from the statements.

3. An evidentiary hearing was held on March 10, 2014, with the plaintiff presenting two law enforcement witnesses[1] and defendant testifying on his own behalf. (D.I. 30)  Although the audio-video recording of defendant's interview was admitted into evidence, it was not played at the hearing.  (D.I. 31, ex.3)[2]  The matter is fully briefed and the evidence reviewed.  (D.I. 22, 25, 26, 27, 28)  The court has jurisdiction pursuant to 18 U.S.C. § 3231.

4. **Findings of fact**.[3]  On October 10, 2013, the Delaware Internet Crimes Against Children Task Force received a report of suspected criminal activity in Delaware.  (D.I. 29, ex.2 at 81)  The report indicted that a user of the America Online, Inc. ("AOL") network was uploading files of suspected child pornography to an AOL account.  AOL reported that the originating IP address of the email with the attached

---

[1]NCCPD Detective Thomas Purse ("Detective Purse") and Special Investigator Dennis Campbell ("SI Campbell") with the Delaware Department of Justice, Child Pornography Task Force.  (D.I. 30 at 3, 33)

[2]Prior to the hearing, plaintiff submitted, under seal, a transcript of the interview. (D.I. 28)

[3]Pursuant to Federal Rules of Criminal Procedure 12(d), the following constitutes the court's essential findings of fact.

2

files of suspected child pornography was identified as 71.162.218.38 ("the IP address"). (*Id.* at 81-82)

5.   On October 17, 2012, a Delaware Department of Justice subpoena was served on Verizon Internet Services ("Verizon") for information and records related to the IP address.  On the same date, Verizon responded with business records indicating that the IP address was assigned to the Verizon Internet account of defendant, at his residence in New Castle, Delaware ("defendant's residence").  (*Id.* at 82)

6.   After conducting surveillance on defendant's residence and running several background investigations, Detective Purse[4] discovered that defendant had prior convictions for sex offenses against minors.  (D.I. 30 at 5-7; D.I. 29 ex.7)

7.   At approximately 6:30 a.m. on December 20, 2013, a search warrant was executed at defendant's residence.  (D.I. 30 at 5)  Detective Purse and SI Campbell[5] were present for the search, along with several other law enforcement officers.  (*Id.* at 7)  Defendant's wife was at home and told officers that defendant had left for work earlier that morning.  (*Id.* at 8)

8.   Detective Purse obtained defendant's cell phone number and called him. Detective Purse told defendant that law enforcement officers were at his residence with a search warrant.  He asked defendant to come to NCCPD headquarters

---

[4]Detective Purse has been a detective for two-and-a-half years.  (D.I. 30 at 3) Prior to that time, he was a patrol and training service officer with NCCPD for 17 years.

[5]SI Campbell has been a special investigator with the Delaware Department of Justice, Child Pornography Task for two years.  (D.I. 30 at 33) Prior to that time, SI Campbell was an investigator, for 24 years, with the Cecil County Sheriff's Office in Maryland.  (*Id.* at 34)

("headquarters") to speak with him about the investigation.  Detective Pursue did not tell defendant that he was required to appear at headquarters or that he had been, or was about to be, charged with any crime. (*Id.* at 8-9, 25)  Defendant agreed to meet Detective Purse at headquarters. (*Id.* at 9)  After the call ended, Detective Purse and SI Campbell left defendant's residence to await defendant's arrival. (*Id.* at 11)  Several law enforcement officers remained at defendant's residence to complete the search.[6]

9.  Defendant drove and parked his Jeep in the front parking lot of headquarters. (*Id.* at 12)  He walked through the parking lot, up the stairs, through an unsecured door into the main lobby of headquarters.  Upon observing defendant's arrival, Detective Purse walked into the main lobby to greet him.  As soon as Detective Purse approached him, defendant said "you got me, the computers are mine." (*Id.* at 13)  In response, Detective Purse introduced himself and asked to speak with defendant. Defendant agreed to an interview.[7]

10.  Detective Purse led defendant[8] from the main lobby through a secured door into a hallway that branched off to a waiting area and three "soft interview rooms" ("interview room")[9] (*Id.* at 14, 28)  They entered an interview room and were joined

---

[6]As a result of the search, officers seized laptop computers, a cell phone, USB thumb drives, various CDs, DVDs and VHS tapes, and a small pen camera. (D.I. 29, ex.2)

[7]At this point, no charges had been filed against defendant. (D.I. 30 at 13)

[8]Detective Purse testified that he did not remove defendant's wallet or keys prior to leaving the main lobby area. (D.I. 30 at 27)  Defendant testified that his wallet and keys were taken before entering the area. (*Id.* at 60-61)

[9]Detective Purse testified that these rooms contained a desk and a few chairs and were used for people not in custody. (*Id.* at 14)

4

immediately by SI Campbell. The interview room was equipped with video and audio recording devices that were activated and captured the interview. (D.I. 29 ex.3; D.I. 30 at 14)

11. Defendant sat in a chair situated closest to the door, with his back facing the door. (D.I. 29, ex.3) Detective Purse sat directly across the table from defendant. SI Campbell was seated to the right of defendant. Defendant was not handcuffed or otherwise restrained. At the evidentiary hearing, defendant testified that because Detective Purse and SI Campbell were very tall, he felt trapped and compelled to answer questions. (D.I. 30 at 69)

12. SI Campbell started the interview by introducing himself and explaining that they were investigating a crime over the Internet and that was the reason for the search of defendant's residence, as well as the reason they asked defendant to come to headquarters. (D.I. 28 at 2-3) SI Campbell thanked defendant for agreeing to speak with them. He explained that, although defendant was not under arrest, he was going to administer *Miranda* warnings to let him "know what his rights" were. (*Id.* at 3)

13. Before SI Campbell could issue the *Miranda* warnings, defendant stated "I'm an ex-cop."[10] (*Id.*) Defendant explained that, in 1987, he was a NCCPD police officer and identified his badge number. (*Id.* at 3-4) In response, SI Campbell and Detective Purse provided their badge numbers. Defendant stated that he was on the police force

---

[10]During cross-examination, defendant explained that he told the officers about his law enforcement experience in order to show familiarity and understanding of *Miranda* warnings. (D.I. 30 at 69)

for only one year, leaving because he is "not politically minded" and "speaks [his] mind."

(*Id.* at 4)  The three, also, discussed their prior miliary service.  (*Id.* at 4-5)

14.  SI Campbell directed the conversation back to the subject of the interview.

SI Campbell stated "we know that there's two people living in the house, and we've,

we've got - it's either- because it's either you or your wife, okay?"  (*Id.* at 5)  Defendant

replied, "it's me."  (*Id.*)  SI Campbell turned to the written *Miranda* form and asked

defendant his full name.  (*Id.* at 6)  As SI Campbell read each *Miranda* warning, he

asked defendant if he understood.  When SI Campbell recited the right to counsel,

defendant stated:

> DEFENDANT:  Yeah, I choose that.
> SI CAMPBELL  Okay.  If you cannot afford to hire a lawyer, one will
> be appointed to represent you before any questioning if you wish one.
> Do you understand that?
> DEFENDANT:  Yep, and I can't afford one, so-
> SI CAMPBELL:  If at any time during this interview you wish to
> discontinue your statement, you have the right to do so.  Do you
> understand that?
> DEFENDANT:  Yes.
> SI CAMPBELL:  Okay do you understand these rights that I have
> explained to you, yes or no?
> DEFENDANT:  Yes.
> SI CAMPBELL:  And having these rights in mind, do you want to talk
> to us at this time, yes or no?
> DEFENDANT:  Like I already said, I choose a lawyer.
> SI CAMPBELL:  Okay.
> DEFENDANT:  But it is enough to say that it's my computers.
> SI CAMPBELL:  Your computers?  Okay.
> DEFENDANT:  I'll leave it at that.

(*Id.* at 6-7)

15.  SI Campbell then inquired whether defendant would consider talking to them

once he had a lawyer.  (*Id.* at 7-8)  SI Campbell explained that they did not intend to

hide anything. In response, defendant stated that "it started innocent" and that a "friend of mine kept on asking me to look for things." (*Id.* at 8) Before defendant could continue, SI Campbell interrupted to ask if he still wanted to retain a lawyer before talking to them. (*Id.*) Defendant responded affirmatively and signed the written waiver form invoking his right to counsel, approximately at 7:30 a.m. (*Id.* at 9)

16. Defendant inquired how long it would take to get a public defender there to talk to him. SI Campbell said that it was defendant's responsibility to obtain a lawyer and that he "could not do anything about [defendant's] representation." (*Id.* at 9) SI Campbell added that if defendant could get an attorney, they "could take care of things today." (*Id.*) SI Campbell reminded defendant that the search warrant, executed earlier in the morning, allowed officers to seize all of the computers at his residence. (*Id.* at 10) SI Campbell then asked defendant to write his address on the *Miranda* waiver form.

17. While filling in this information, defendant stated "now, see, the only reason why I can't talk to you guys is because of the first time, I got screwed over." (*Id.* at 10) Defendant explained that, because of problems with his prior arrest, trial and conviction, he wanted to protect himself. (*Id.* at 70) Defendant asked if he could talk to SI Campbell "off the record," which SI Campbell said they could not, adding, "you can say what you want to say, as long as it's clear that I'm not asking you questions or forcing you to do that." (*Id.* at 11)

18. Defendant proceeded to admit that the computers belonged to him and that there were no passwords on them. Defendant then asked what else they needed to

know. (*Id.* at 12)  SI Campbell stated that he needed more detail, but that he would not ask any questions until defendant had an attorney.

19. Defendant inquired how to contact a public defender. (*Id.* at 13)  SI Campbell asked Detective Purse if he knew how to do so.  Detective Purse denied having any contact information, advising defendant to call the Attorney General's Office for information. (*Id.* at 13)  Defendant responded by recounting problems associated with the investigation, trial and conviction for sexual offenses involving a minor. (*Id.* at 13-14)  Defendant spoke for several minutes before SI Campbell ended the interview by shaking hands and expressing appreciation for defendant speaking with them. (*Id.* at 13-18)  SI Campbell provided contact information and invited defendant to give him a call in the future. (*Id.* at 13-18)  This interview lasted approximately 15 minutes.

20. Detective Purse escorted defendant from the interview room, down the hallway and through the secured door into the main lobby. (D.I. 30 at 18-20)  Because defendant had not been charged with any crime, he was free to leave.  Defective Purse returned to the hallway to speak with his supervisor, who advised that they would be seeking a search warrant for defendant's Jeep. (*Id.* at 20)

21. Detective Purse walked back into the main lobby and was immediately approached by defendant. (*Id.* at 21)  According to Detective Purse, defendant stated "I just want to get this taken care of.  I don't need a lawyer.  I want to talk to you." (*Id.* at 21, 31)  Detective Purse told defendant that the police were going to obtain a search warrant to search his Jeep.  He responded "okay." (*Id.* at 21)  Detective Purse asked defendant for the car keys and defendant complied. (*Id.* at 22, 30)

8

22. Defendant testified that when Detective Purse returned to the main lobby, he came up to, and "basically blocked," defendant from leaving the area. (*Id.* at 62) According to defendant, Detective Purse wanted to know if he had any "thumb drives" and, then, "took the [Jeep] keys." (*Id.*) Next, Detective Purse escorted defendant back through the secured door into the waiting area, adjacent to the soft interview rooms. (*Id.* at 22, 31, 63) Defendant testified that, while with Detective Purse, he felt he could not leave headquarters. (*Id.* at 63)

23. Detective Purse then returned to his office to prepare a search warrant for the Jeep, leaving defendant alone in the waiting area. (*Id.* at 23) Shortly thereafter, SI Campbell arrived and the two started talking about defendant's job and wife. (*Id.* at 39-40) Defendant testified that, during this conversation, he felt "trapped" because they had his car keys. (*Id.* at 65) Defendant felt that the only way to find out information about his wife was to agree to an be interviewed again. (*Id.* at 64) Toward the end of the conversation, SI Campbell testified that defendant asked to be interviewed a second time about the investigation. (*Id.* at 41-42)

24. Before discussing the matter further, SI Campbell asked defendant to wait for a moment while he obtained another Miranda warning form. (*Id.* at 42) When SI Campbell returned, they entered the same soft interview room and sat in the same seats as during the first interview.[11] (*Id.* at 43)

---

[11]Because the audio and video equipment was not turned off after the first interview, the conversation between SI Campbell and defendant in the waiting room area (just outside the interview room), as well as the two-hour second interview conducted inside the room were recorded.

25.  SI Campbell started the conversation by reviewing defendant's earlier

request for an attorney and the termination of the interview.[12]  (*Id.* at 43; D.I. 28 at 20)

SI Campbell offered the explanation that defendant had thought about what had

occurred, changed his mind, and returned to be interviewed.  Defendant denied that

anyone threatened or made promises to induce him into speaking.  Next, SI Campbell

read the *Miranda* warnings.  (D.I. 28 at 20-21) The following conversation occurred:

> SI CAMPBELL: If at any time during this interview you wish to
> discontinue your statement, you have the right to do so. You want
> to stop, just tell me you want to stop.
> DEFENDANT: Right.
> SI CAMPBELL: Okay?
> DEFENDANT: See, but the only thing I don't understand is, when
> it says that, it says that I have a right to an attorney and if I can't
> afford one it would be appointed for me.  But yet, you know, it's
> a contradictory statement.
> SI CAMPBELL: Well, yeah, but you've got to seek that.  You've
> got to seek that attorney. I mean, but yeah-
> DEFENDANT: Yeah, but -
> SI CAMPBELL: I understand what you've saying.
> DEFENDANT: Yeah.
> SI CAMPBELL: All right.  Do you understand each of these rights
> I've explained to you, yes or no?
> DEFENDANT: Yes, and yes.

(*Id.* at 21-22)[13]

26.  Defendant signed the *Miranda* waiver form at 7:54 a.m., after acknowledging

that he understood the rights as read by SI. Campbell.  (*Id.* at 74-76)  Defendant

proceeded to talk with SI Campbell for over two hours, making incriminating statements

and offering to cooperate against individuals involved in sex offenses against children.

---

[12]Approximately 13 minutes elapsed between the first and second interview.

[13]During the evidentiary hearing, defendant acknowledged that he understood
the rights as recited by SI Campbell.  (*Id.* at 74-76)

(D.I. 28)  Throughout the interview, defendant sat, relaxed in his chair, at times leaning against a wall, as he calmly and methodically described his conduct regarding the charged offenses.  He conceded that it was in his best interest to cooperate in order to help his own case, even offering to demonstrate how to navigate various Internet pornography websites.  (*Id.* at 52, 73)

27.  **Standard of review.**  "Where a defendant seeks to suppress a statement under *Miranda,* the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of *Miranda* warnings."  *United States v. Kofsky,* No. 06–392, 2007 WL 2480971, at *14 (E.D. Pa. Aug.28, 2007) (citing *Colorado v. Connelly,* 479 U.S. 157, 168 (1986)); *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989).

28.  The court is charged with reviewing the credibility of witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence.  *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir. 1993); *United States v. Williams*, 400 F. Supp.2d 673 (D. Del. 2005).

29.  **Conclusions of Law.**  In *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), the Supreme Court held that the government "may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the [Fifth Amendment's] privilege against self-incrimination."  The well-established "procedural safeguards" include a warning that, among other things, the defendant has a right to remain silent, any statements he

11

makes can be used as evidence against him, and he has a right to have an attorney present with him before and during questioning. *Id.*

30. Law enforcement officers, however, "are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Rather, *Miranda* warnings are only required when "there has been such a restriction on a person's freedom as to render him 'in custody.' " *Id.* (citation omitted). The Supreme Court recently explained that "custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, __ U.S. __, 132 S.Ct. 1181, 1189 (2012). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323 (1994). A "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112 (1995).

31. To determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine the totality of the circumstances surrounding the interrogation. *Stansbury,* 511 U.S. at 322, 325. Relevant factors to consider include: (1) the location of the questioning; (2) the duration of the questioning; (3) statements made during the questioning; (4) the presence or absence of physical restraints during the questioning; and (5) the release of the interviewee at the end of the questioning. *Howes v. Fields*, 132 S.Ct. at 1189-90 (citations omitted).

12

32. The analysis, however, does not end with whether the individual's freedom of movement was restricted. *Id.* Courts must also consider whether the relevant environment contains "inherently coercive pressures" and examine "all of the features of the interrogation." *Id.* at 1190, 1192. These factors include the language used to get the individual to the questioning and the way the interrogation was conducted. *Id.* at 1192.

33. Considering this authority in light of the record,[14] the court finds that defendant was not in custody during the interview and, accordingly, *Miranda* was not implicated. Significantly, the record reflects that defendant voluntarily agreed to leave work to meet and talk with Detective Purse at NCCPD. Defendant drove alone in his Jeep to headquarters. Upon meeting Detective Purse, defendant immediately made statements about the case. He, then, agreed to be interviewed and accompanied Detective Purse from the main lobby into a more secure area. At no time during this initial encounter was defendant placed under arrest or told that he had to submit to an interview.

34. Although defendant testified that Detective Purse's height made him feel compelled to be interviewed, the court finds nothing to substantiate this claim. In this regard, the court credits Detective Purse's testimony. The initial encounter occurred during the morning in a public area and was very brief. Defendant did not testify that Detective Purse acted in any manner that was threatening or coercive or used any

---

[14]Including: (1) pre-hearing briefs and submissions; (2) the testimony of Detective Purse, SI Campbell and defendant; (3) the exhibits introduced into evidence at the evidentiary hearing; (4) the recorded interview; and (5) the sealed transcript of the interview. (D.I. 22, 25, 26, 27, 28, 29, 30)

13

language that caused defendant to believe he was not free to leave. *See Howes v. Fields*, 132 S.Ct. at 1189-92.

35.  Once in the soft interview room, defendant sat, unrestrained, in a chair situated closest to the door. Before questioning started, SI Campbell explained that defendant was not under arrest or in custody and that he could end the interview at any time. Further, SI Campbell stated that, even though defendant was not under arrest, he would be read the *Miranda* warnings as a precaution. Defendant replied that he was a former NCCPD officer and provided information about his assignments and station. From this response, the court infers that defendant was telling the officers that he understood *Miranda*, specifically, and law enforcement procedures, generally. Likewise, defendant's discussion about his prior arrest, trial and conviction demonstrated his familiarity with the criminal justice system. After being advised of his *Miranda* warnings, defendant invoked his right to counsel and the questioning stopped. Detective Purse then escorted defendant to the main lobby where he was free to leave. The totality of the circumstances of this first interview, the court concludes, would not have caused a reasonable person to have felt unable to terminate the interrogation and leave. *Id.* at 1194.

36.  Turning to what next happened in the short time that defendant was in the lobby between the first and second interview, the court relies on the testimony presented at the evidentiary hearing. Detective Purse's and defendant's testimony reflect that defendant was escorted to the main lobby and was free to leave. Before defendant left headquarters, however, Detective Purse returned to the main lobby and

14

engaged defendant. While defendant contends that Detective Purse stood so as to block him, defendant's testimony failed to specifically detail how Detective Purse positioned himself in an obstructive manner or how he was in fact prevented from leaving. Although the subject of their ensuing conversation is disputed, they both agree that Detective Purse asked defendant for the keys to the Jeep and defendant complied, without objection. Defendant then walked, freely, with Detective Purse to the soft interview room area and, shortly thereafter, commenced a two-hour interview with SI Campbell. Nothing during this brief encounter demonstrates to the court that defendant was in custody.

37. With respect to defendant's contention that the height of SI Campbell and Detective Purse caused him to feel trapped and compelled to consent to an interview, the court finds nothing to substantiate this claim. By his own account, defendant never expressed these concerns nor exhibited any conduct indicative of such concerns to Detective Purse or SI Campbell. Moreover, during the evidentiary hearing, defendant failed to explain how they used their height to coerce or impede defendant. Further, in the recording of the initial stage of second interview, defendant appears relaxed and comfortable. He eagerly initiated conversation and responded promptly to questions, never exhibiting feelings of being trapped or compelled. The court concludes that there were "no inherently coercive pressures" evident in these circumstances. *Id.* at 1189-90.

38. In light of *Miranda* and its progeny, the court concludes that the record does not demonstrate that defendant was in custody during any portion of the interview. Assuming arguendo, however, that defendant was in custody, the court finds that he knowingly and voluntarily waived rights.

15

39.  The Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. *Patterson v. Illinois,* 487 U.S. 285, 292, n. 4 (1988); *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005).  Courts must consider the totality of the circumstances in determining whether the waiver and resulting statement is the "product of a free and deliberate choice rather than intimidation, coercion or deception."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

40.  A statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991).  In evaluating the totality of the circumstances, courts should examine "some traditional indicia of coercion," including:  (1) the duration and conditions of detention; (2) the attitude of the police toward the suspect; (3) the suspect's maturity, education, physical condition and mental state; (4) the suspect's background and experience; and (5) the suspect's prior dealings with the criminal justice system.  *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005); *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002).

41.  Based on the totality of the circumstances, there is no indicia of coercion present.  Defendant was a police office with a prior conviction, establishing that defendant had experience with the criminal justice system.  Prior to the second interview, defendant gave the Jeep keys to Detective Purse and voluntarily retreated to the soft interview area for a second interview.  Prior to commencing the second interview, SI Campbell reiterated what had occurred during the first interview and

observed that defendant had reconsidered his earlier invocation of *Miranda* and changed his mind. Defendant did not contradict SI Campbell's summary. SI Campbell read the *Miranda* warnings and defendant signed the form, evincing his waiver of counsel and intention to be interviewed. At no time did defendant indicate that he was coerced into making statements or that his will was otherwise impaired.

42. To the extent defendant argues that the height of SI Campbell and Detective Purse somehow coerced him into waiving his *Miranda* rights, the evidence of record does not support this claim. As noted above, defendant did not explain how they used their height to adversely affect him. Similarly, there was nothing to corroborate defendant's claim that Detective Purse blocked him from leaving the main lobby. Accordingly, the court finds that, assuming arguendo that defendant was in custody, defendant knowingly and voluntarily waived his *Miranda* rights.

43. **Conclusion**. Given the court's conclusions, defendant's motion to suppress is denied. An appropriate order shall issue.

United States District Judge

17